## FLAVIN, ESTATE OF, In Re

Ohio Appeals, 5th Dist, Morrow Co

Decided April 29, 1938

E. M. Wickham, Delaware, for exceptor.
Benjamin Olds, Mt Gilead, for guardian.

### OPINION

By LEMERT, J.

This cause comes into this court on an appeal on questions of law from the findings and order of the Common Pleas Court of Morrow county, Ohio. Said action was heard by the Common Pleas Court of Morrow county on an appeal from the Probate Court of said county.

Betty Belle Flavin was a minor and a ward of the Probate Court of Morrow county, Ohio. On or about May 6, 1931, J. W. Glauner was appointed and qualified as guardian of her person and estate. Said Glauner was a former probate judge of Morrow county, Ohio, having served in that capacity for eight years, and for more than ten years was in the banking business at Mt. Gilead as cashier and president of the National Bank of Morrow county, and later was connected with the Mt. Gilead National Bank of Mt. Gilead, Ohio. The said Glauner deposited moneys belonging to his ward, first in the National Bank of Morrow county, of which he was then president, and later when said bank was taken over by the Mt. Gilead National Bank, the said Glauner entered into the employ of the latter bank, and the ward's funds were placed in said Mt. Gilead National Bank. Said bank was closed on the banking holiday of March 4, 1933, and was not permitted to reopen and has ever since been in the process of liquidation. Creditors of the bank have received about fifty per cent of the amount that they deposited with that institution and the balance is still, as far as this record shows, unpaid.

On June 10, 1935, the said Glauner filed his final account and tendered his resignation, and in this account, among other things, he seeks exoneration for the money lost to his ward's estate by the failure of the Mt. Gilead Bank. Exceptions were taken to said account, in substance as follows:

(a) Failure of said guardian to charge himself with sufficient interest on the amount of money in his hands during the accounting period.

(b) Guardian's claim for credit for $318.48 listed as restricted checking account, Mt. Gilead Bank.

(c) Guardian's claim for $806.56, listed as restricted savings account, Mt. Gilead National Bank.

(d) Guardian's claim for credit for $86.52 listed as Flavin Brothers rent account, Mt. Gilead National Bank.

(e) Claim for payment of $50 as attorney fees due Benjamin Olds for service in land sale and preparing said account.

(f) Claim for credit of $116.66 as proceeds of sale of real estate.

These exceptions came on to be heard before the Probate Court of Morrow county and were sustained in all respects except for "f"—that is, the claim for credit for $116.66 as proceeds of sale of real estate, and the costs were assessed against said Glauner. From this order of the Probate Court the said Glauner appealed to the Common Pleas Court of Morrow county, and the said exceptions came on for trial February 9, 1937. At the close of the trial counsel on behalf of the exceptors requested separate findings of fact and conclusions of law; and on October 13, 1937, the Common

Pleas Court rendered his decision in said case, reversing the Probate Court in certain respects. In the meantime, shortly after the resignation of the guardian, Glauner, the Probate Court of Morrow county appointed the appellant C. W. Swisher, as guardian of the person and estate of the said Betty Belle Flavin; and this appeal is taken by said Swisher as guardian on behalf of his ward.

We note from the record before us that to this date the said Glauner has not turned over to the said Swisher any part of the assets belonging to said minor's estate and is still in full possession of all the assets shown in the final account.

In the trial of this action we note that the point was made that the bank during the greater portion of its time preceeding its closing did not keep its required legal reserve. The record before us shows that it is not a question of opinion as to whether or not the bank maintained its required legal reserve but is a matter of absolute fact, to be determined by simple mathematical calculations. The guardian himself testified that he knew about legal reserve requirements for a National Bank under the National Banking Act, and knew that a National Bank under this Act is required to keep a legal reserve with the Federal Reserve Bank, and knew that this legal reserve is a sum of money based on the time and demand deposits, and that during the period in question this reserve was computed by taking three per cent of the time deposits and seven per cent of the demand deposits.

An examination of the record before us shows that on March 31, 1932, the said bank was below its required legal reserve and continued to be below its required legal reserve until the time of the bank holiday in March of 1933.

Witnesses for the guardian, himself, admitted that the bank was below its legal reserve, and the testimony along this line is positive and overwhelming.

The record clearly shows that the condition of this bank clearly showed failing circumstances and was sufficient to excite suspicion and that this guardian was in a position to know its shaky and precarious condition.

We are clearly of the opinion that the repeated and continued failure to maintain the required legal reserve is an indication of instability and insolvency in any bank.

The record before us shows that the witnesses for the guardian admitted this fact. A careful examination of this record convinces us that this bank was insolvent and

in the exercise of reasonable judgment and foresight, considering the position that the guardian was in with the bank, he could not help but know that the bank was insolvent, and as a further evidence of that fact is was not permitted to reopen its doors after the banking holiday; and the record shows that after four years of liquidation only fifty per cent of the depositor's accounts have been paid, and at the time of trial no substantial amount more had been collected to liquidate the fifty per cent balance. We note the fact that Glauner, the guardian, was connected with the National Bank of Morrow county, ten or twelve years, first as cashier and later as president, and later connected with the Mt. Gilead National Bank from the time the National Bank of Morrow county was taken over by that bank until its closing on the banking holiday. He testified that during the years 1931, 1932, and 1933, the economic condition of the country, especially in Morrow county, was in a very precarious condition; that as a banker he was acquainted with banking methods and practice and knew banking conditions and was aware of the banking conditions at large and the Morrow county condition particularly during that time, and knew that at the beginning of 1931 there was a great number of bank failures in the country and in Ohio, and that these failures were continuing right along until the crisis culminated in the banking holiday. He further testified that he knew how to read bank statements and would be able to tell upon reading a bank statement something about its condition; that he knew about the requirements such as legal reserve for a National Bank, and also that he knew many assets of the banks during that period, in the form of loans to individuals and represented by notes, were not what would be called "liquid", and that borrowers were hard pressed and unable to meet the terms of their paper in a great many instances. He denied, however, that he knew the condition of the Mt. Gilead National Bank, in which he had his ward's funds.

It is only natural that said guardian should so testify. To admit otherwise would be to admit liability and put an end to this case. With this in mind, it is difficult to understand how this guardian could really believe in the solvency of this institution, especially when one looks over the exceptions to exhibit No. 14, which is the guardian's own personal checking account and notes there that while this party had carried balances in this bank in excess of one thousand dollars and for considerable pe-

riods carried balances between Five Hundred and a Thousand Dollars, he gradually withdrew his own funds from the institution so that at the time of the closing of the bank and the bank holiday he had only, of his own money $107.39 in this bank. His conduct with his own money speaks louder than his protestations to avoid liability. However, it is not what he believed through faith in the bank that counts, but whether he exercised the degree of care and prudence imposed upon him by law under the circumstances.

It is interesting to note that this guardian testified that he was afraid of government bonds and real estate mortgages and thought that the safest investment was in bank accounts. In other words, he wants to say that he preferred a bank that had about eighty per cent of its assets in unsecured promises of individuals who were unable to pay on demand and were having to renew their loans to the faith and credit of the United States Government and other legal bonds and investments.

The interpretation that the court below seems to put on this finding is that all losses during the depression were excusable because of the uncertainty of the times.

We gather from the record that after the Mt. Gilead National Bank closed on the bank holiday and was not permitted to re-open, the guardian, Glauner, on behalf of his ward's estate signed an agreement to permit the bank to be reorganized and open upon the payment of fifty per cent and the restricting of the balance. This guardian seemed to be interested in the reopening of the bank at this time. He, the guardian, was personally interested in the welfare of the Mt Gilead National Bank prior to the banking holiday and was willing to do what he could to help it along. At tne time this bank closed the guardian had given up the idea of investing his ward's funds in mortgages and in bonds and had placed the money in the bank as an investment for the estate, and this without any authority from the Probate Court under which he was acting.

Sec 10506-41 GC enumerates the kinds of securities in which a fiduciary may deposit funds belonging to the trust.

Sec. 10506-45 and §10506-46 GC provide specifically and definitely what a fiduciary is authorized to do and what he is prohibited from doing. It is our understanding that by the clear and plain wording of §10506-45 GC a deposit in a bank is only permissible pending distribution or investment in conformance to law and that it is not

permissible to make such a deposit as a permanent investment, such as the guardian did here according to his own admission. There is no other logical way in which to reconcile §§10506-41 and 10506-45 GC for otherwise §10506-45 GC would require all trust funds to be deposited in banks and would render nugatory the clear mandates of §10506-41 GC.

It seems to us that it is elementary that if a guardian makes an illegal investment of his ward's funds, one not authorized by law or by the Probate Court, he is liable for the loss that may be occasioned thereby, regardless of the question of due care. Soliday v Ash, 40 Oh Ap 498.

"A guardian is required to exercise good faith and due care in investing the funds of a ward, and in making such investments is only protected against liability on his bond for loss to his ward if he invests the funds in investments approved by the statute." In Re Michael, 18 Abs 629.

This principle has been recognized by many authorities in other states. In 1 N. E. (2nd), page 50, decided by the Supreme Court of Illinois, February 14, 1936, the court referred to the statutes of Illinois, which are similar to those of Ohio in classifying permissible investments by fiduciaries, and says, on page 52:

"The statutory requirements relating to investments by guardians and conservators are mandatory * * * They specify the securities upon which funds of a ward may be loaned, and in that regard they supersede the common law."

See also 271 N. W. 326, decided by the Supreme Court of Wisconsin, February 9, 1937.

On the strength of the foregoing authorities and since this guardian admitted that he left the money in the Mt. Gilead National Bank as an investment rather than as a deposit pending investment or distribution according to law, he is liable as a matter of law, regardless of any question of good faith or due care.

The guardian, Glauner, is liable for losses occasioned this ward's estate because he did not use the degree of care imposed upon him by law in depositing his ward's funds in the bank in question and in leaving them there until the bank closed.

Looking at this case from the standpoint of merely requiring ordinary care on the part of the guardian, it is clear to us that he

should be held liable for the losses suffered by his ward. Steward v Barry, Admr., 102 Oh St 129; In re Estate of Howison, 49 Oh Ap 421, 3 OO 301.

A very interesting case, and one that seems to us is decisive of the instant case, is the case In re Hoffman Estate, 225 N. W. 717, decided by the Supreme Court of South Dakota, in 1929:

"A guardian kept his ward's funds in a bank in which he was the director, cashier and managing officer. The bank's statements showed that it had fallen below its required legal reserve. It failed and then the guardian joined in an agreement for the reorganization of the bank.Thus in all respects this case is parallel with the case at bar. Held: The guardian is liable for the loss occasioned through the bank's insolvency. The court pointed out that the legal reserve law was enacted for the benefit and protection of the bank's creditors and that by knowingly permitting the deposit of his ward's money to remain in a bank which was violating this law, he was not using the degree of care incumbent upon him."

So that, without burdening this opinion with further authorities, we recognize the main and principle question here is, who shall bear and suffer this loss? Shall it fall upon this little girl or shall it fall upon the guardian? The little girl was helpless and very tender in years and the Probate Court had trusted the guardian to take care of her money. Some day perhaps this bank will probably pay further dividends. The question is here, who shall wait and take chances? We are of the opinion that under the authority of the Howison case the guardian must take that chance. He must pay the money now and be subrogated to the claim against the bank.

So that we find this guardian made an illegal investment of his ward's funds. He is therefore liable for the resulting loss, regardless of the question of care, and we find that said guardian did not use that degree of care imposed upon him by law under all the circumstances of the case. He was a former probate judge and for many years a banker and was working in the institution where the money was kept. He knew or in the exercise of ordinary care should have known its condition and should have seen that it was insolvent. We are of the opinion that this insolvency was clearly apparent, for the following reasons: The bank had borrowed a large sum of money, which indicated that its notes, in which about eighty per cent of its assets were invested, were not readily collectible. Otherwise the notes could have been collected and it would not have been necessary to borrow the money from other banks. It is the undisputed evidence that this bank was not making any new loans, and that nearly all the items listed in the loan account were old obligations, mostly renewals. The bank was below its legal reserve most of the time during the last two years immediately preceeding its closing, and it is recognized that failure to maintain the legal reserve is some evidence of instability and insolvency of a banking institution. The precarious conditions of banks during the period in question was calculated to put all parties on extraordinary guard against unfavorable conditions of any banking institution.

It is to be noted that while this guardian claimed he was afraid of government bonds and real estate mortgages as investments, he felt perfectly safe about a bank which had as its assets not only this same kind of investment but also the unsecured and uncollectible obligations of individuals in the community. This guardian was admittedly trying to help the financial condition of the bank rather than his own ward. He admitted that he wanted to help the bank and his conduct bears this statement out. He left this money in the bank without taking any of it out until the bank failed and he then signed a reorganization agreement on behalf of the trust. It has been the law for two thousand years that no man can serve two masters. The guardian could not fairly and honestly represent his ward and the bank at the same time.

It is therefore our opinion that the finding and judgment of the Common Pleas Court, in so far as it reverses the Probate Court, is reversed and the finding and judgment of the Probate Court is affirmed.

MONTGOMERY, PJ, and SHERICK, J, concur.